**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

WILLIAM LEE LAIRD, SR.,     *
             *
     Plaintiff,    *
             *
     v.       *   Civil No. SAG-11-2043
             *
MICHAEL J. ASTRUE,     *
*Commissioner of Social Security,*  *
             *
     Defendant.   *

******

**MEMORANDUM**

 Pending before this Court, by the parties' consent, are cross–motions for summary judgment concerning the Commissioner's decision denying William Lee Laird's claim for Disability Insurance Benefits ("DIB"). (ECF Nos. 14, 16). This Court must uphold the Commissioner's decision if it is supported by substantial evidence and if proper legal standards were employed. 42 U.S.C. § 405(g); *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996); *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). A hearing is unnecessary. Local Rule 105.6 (D. Md. 2011). For the reasons that follow, this Court GRANTS the Commissioner's motion and DENIES Mr. Laird's motion.

 **I. BACKGROUND**

 William Lee Laird ("Mr. Laird" or "Claimant") applied for DIB on March 4, 2008, alleging that he has been disabled since January 1, 2008[1] due to a heart condition, depression and stress. (Tr. 158). His claims were denied initially and upon reconsideration. (Tr. 75-80, 84-85). A hearing was held before the Honorable Judith A. Showalter, Administrative Law Judge ("ALJ"), on November 10, 2009, where Mr. Laird appeared with counsel and testified. (Tr. 29-

---

[1] Mr. Laird initially stated that he had stopped working on May 3, 2007. (ECF 14-2, 16-1). He amended his onset date to January 1, 2008, because he was receiving unemployment benefits during the interim period. *Id., see* Tr. 118.

74).   The ALJ subsequently denied Mr. Laird's claims in a decision dated January 29, 2010. (Tr. 17-28).   The ALJ found that although Mr. Laird's coronary artery disease, obesity, depression and anxiety were all "severe" impairments as defined in the Regulations, they did not meet or medically equal any of the listed impairments found in the Regulations.   (Tr. 19-22).   The ALJ also determined that Mr. Laird retained the residual functional capacity ("RFC") to perform a limited range of light work.  (Tr. 16-21).   The ALJ found that Mr. Laird was not able to perform any of his past relevant work.   (Tr. 26).   After receiving testimony from a vocational expert ("VE") and considering Mr. Laird's age, education, work experience, and RFC, the ALJ determined there were jobs that existed in the national and local economies in significant numbers which Mr. Laird could perform.   (Tr. 27).   Accordingly, the ALJ found Mr. Laird was not disabled. (Tr. 27-28). On June 22, 2011 the Appeals Council denied Mr. Laird's request for review, making his case ripe for judicial review. (Tr. 1-5).

## II.  STANDARD OF REVIEW

The function of this Court is not to review Mr. Laird's claim *de novo* or to reweigh the evidence of record.  *Smith v. Schweiker,* 795 F.2d 343, 345 (4th Cir. 1986).  Rather, this Court is to determine whether, upon review of the whole record, the Commissioner's decision is supported by substantial evidence and is a proper application of the law.  *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990); *Coffman,* 829 F.2d at 517; *see* 42 U.S.C. § 405(g) (2009).

Substantial evidence is more than a scintilla but less than a preponderance of the evidence presented.  *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1996).  It is such relevant evidence as a reasonable mind might accept as adequate to support a verdict were the case before a jury. *Johnson v. Califano,* 434 F.Supp. 302, 307 (D. Md. 1977).  Usually, if substantial evidence supports the Commissioner's decision, the decision must be upheld.  *Cook v. Heckler,* 783 F.2d

1168, 1172 (4th Cir. 1986); *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972); *see* 42

U.S.C. § 405(g).

In addition to reviewing the ALJ's decision to determine whether it is supported by

substantial evidence, this Court also must determine whether the ALJ properly applied the law.

"A factual finding by the ALJ is not binding if it was reached by means of an improper standard

or misapplication of the law." *Coffman,* 829 F.2d at 517.  After reviewing the ALJ's decision,

this Court may affirm, modify, or reverse the decision of the ALJ and may remand the case for a

rehearing. *Melkonyan v. Sullivan,* 501 U.S. 89, 98 (1991); *Coffman,* 829 F.2d at 519; *Vietek v.*

*Finch,* 438 F.2d 1157, 1158 (4th Cir. 1971); *see* 42 U.S.C. § 405(g).

The Commissioner has promulgated regulations that set forth the following five-step

sequential evaluation procedure to determine whether a claimant is disabled:

> (1) The ALJ determines whether the claimant is engaged in substantial gainful
> activity as defined in 20 C.F.R. § 404.1571 and § 416.971 *et seq*. If so, the
> claimant is not disabled.

> (2) If not, the ALJ examines the physical and/or mental impairments alleged by
> the claimant and determines whether these impairments meet the durational and
> severity requirements set forth in 20 C.F.R. § 404.1520 and § 416.920. If not, the
> claimant is not disabled.

> (3) If so, the ALJ considers whether the impairment or impairments, either
> severally or in combination, meet or equal an impairment listed in 20 C.F.R. Part
> 404, Subpart P, Appendix 1, known as the Listing of Impairments. If so, the
> claimant is disabled.

> (4) If not, the ALJ considers whether the claimant retains the residual functional
> capacity ("RFC") to do past relevant work ("PRW"). If so, the claimant is not
> disabled.

> (5) If not, the ALJ determines whether the claimant is capable of some other work
> based on the claimant's RFC, age, education, and past work experience. The
> Commissioner bears the burden of proof at step five. *Pass v. Chater*, 65 F.3d
> 1200, 1203 (4th Cir.1995). If the claimant is not capable of other work, the
> claimant is disabled.

*See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *Bowen v. Yuckert*, 482 U.S. 137 (1987).

### III.    ALJ'S DECISION

After reviewing the medical record and hearing testimony from witnesses, the ALJ evaluated Mr. Laird's claims using the Social Security Administration's five-step sequential process and made the following relevant findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.  The claimant has not engaged in substantial gainful activity since January 1, 2008, the alleged onset date (20 C.F.R. 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: coronary artery disease; obesity; depression and anxiety (20 C.F.R. 404.1520 (c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he could never climb a ladder, rope or scaffold; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; would need to avoid concentrated exposure to extreme heat, odors, gas, poor ventilation; would require simple, unskilled work; would need work with only occasional contact with co-workers; would require work not at a production pace defined as not paid by the piece and not on an assembly line and would require low stress jobs defined as only requiring occasional changes in the work setting.

6.  The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565).

    . . .

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2008 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 19-27).

IV.     SUMMARY OF EVIDENCE

At the time of his administrative hearing, Mr. Laird was fifty-two years old, was 5'8" tall, and weighed approximately 262 pounds. (Tr. 35).  Mr. Laird has a ninth-grade education and can read and write in English.  (Tr. 36).  He alleged disability due to coronary artery disease, depression, and stress. (Tr. 158).

A. Physical Impairments

Mr. Laird has a history of heart disease.  In 2004, Mr. Laird underwent three-vessel coronary bypass surgery.  (Tr. 222, 263).  In January 2005, he had a heart catherization.  *Id.*  On February 5, 2007, Mr. Laird reported to his cardiologist, Jeffrey Etherton, M.D., that he had recently experienced episodes of shortness of breath and chest tightness.  (Tr. 262, 313).  Dr. Etherton noted that Mr. Laird had coronary artery disease, coronary artery bypass surgery, hyperlipidemia, hypertension, and a previous heart attack.  *Id.*

Mr. Laird went to the emergency room at the Peninsula Regional Medical Center on May 21, 2007, complaining of chest pain.  (Tr. 222).  Mr. Laird reported recent chest pain during exertion.  (Tr. 243).  He also reported that he had no breathing problems or trouble walking short distances.  *Id.*  After his hospital stay, on July 3, 2007, a nurse practitioner in Dr. Etherton's office "reassured [Mr. Laird] that his recent stress test was unremarkable." (Tr. 261).  She also noted that he described symptoms of depression and told her he was anxious and felt discomfort in his chest that he believed "totally correlated" with his feelings of anxiety about his employment. *Id.*

On August 3, 2007, Mr. Laird saw Dr. Etherton, who reported no "significant changes" in Mr. Laird's cardiac condition.  (Tr. 260).  On January 23, 2008, Mr. Laird's condition had improved.  (Tr. 259).  Dr. Etherton noted that his patient had "done very well" since his last visit

and had not experienced any "chest pain, palpitations, dizziness, or any other new symptoms." *Id.*   Mr. Laird also told Dr. Etherton that he remained very active and had found new employment, reprocessing scrap metal.  *Id.*   Mr. Laird visited Dr. Etherton on July 30, 2008. (Tr. 344). Mr. Laird reported  that he had not had any recent chest pain, pressure, shortness of breath, palpitations, dizziness, or loss of consciousness. *Id.*

Mr. Laird visited Dr. Etherton on November 25, 2008. (Tr. 389).  Mr. Laird complained of chest pains that he relieved with nitroglycerin.  *Id.* Dr. Etherton wrote that Mr. Laird had "progressive fatigue and [shortness of breath] on exertion," and that his patient "is unable to complete even mild or moderate tasks." *Id.*  On the same day, Dr. Etherton completed a Medical Assessment of Ability to do Work-Related Activities (Physical) for Mr. Laird. (Tr. 379-82).  Dr. Etherton concluded that Mr. Laird could not lift or carry any weight, could not stand, walk, or sit any hours in an eight-hour workday, and could never do many of the postural and physical activities required during a workday.  (Tr. 379-81).  Dr. Etherton also opined that Mr. Laird's heart disease imposed environmental limitations in situations involving heights, moving machinery, temperature extremes, fumes, and humidity.  (Tr. 381).  Dr. Etherton noted that these limitations had been present since June, 2007. (Tr. 382). Dr. Etherton also completed an American Heart Association Classification of Patients with Diseases of the Heart Form. (Tr. 383).  Dr. Etherton classified Mr. Laird as having Class III functional capacity and Class D therapeutic classification, indicating that his physical activity should be markedly restricted.  *Id.*

On September 1, 2009, Dr. Etherton noted that Mr. Laird continued to have intermittent episodes of chest pain and shortness of breath and fatigued easily.  (Tr. 390).  Dr. Etherton continued Crestor for lipid therapy and adjusted Mr. Laird's blood pressure medication.  *Id.*

L. Robbins, M.D., reviewed Mr. Laird's medical records and completed a Physical Residual Functional Capacity Assessment on April 30, 2008. (Tr. 314-21).  Dr. Robbins opined that Mr. Laird could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk (with regular breaks) for about six hours in an eight-hour workday, and sit (with normal breaks) for about six hours in an eight-hour workday.  *Id.*  Dr. Robbins also found that Mr. Laird's ability to push or pull was unlimited.  *Id.*

J. Biddison, M.D., completed a physical RFC assessment of Mr. Laird on October 22, 2008, and reached conclusions somewhat more limited than those of Dr. Robbins. (Tr. 370-77). Dr. Biddison opined that Mr. Laird could occasionally lift and/or carry twenty pounds, could frequently lift and/or carry ten pounds, could stand and/or walk about six hours in an eight-hour workday, could sit (with normal breaks) for a total of about six hours in an eight-hour workday, and could push/pull without any limits except those previously identified. (Tr. 371). Dr. Biddison found that Mr. Laird's ability to climb, balance, and stoop was occasionally limited, but he otherwise did not have any postural limitations. (Tr. 372).

### B.  Mental Impairments

On April 27, 2007, Mr. Laird visited his primary-care physician, Christjon Huddleston, M.D., complaining of difficulty sleeping and anxiety.  (Tr. 282).  Dr. Huddleston prescribed Zoloft and Ambien.  (Tr. 282).  On May 16, 2007, Mr. Laird reported continuing problems with sleep and anxiety attacks.  Mr. Laird also reported that he was having difficulties at work and had been placed on administrative leave.  (Tr. 281).  Dr. Huddleston adjusted Mr. Laird's medications.  *Id.*

Mr. Laird visited James Roessler, a licensed professional counselor, seven times between May 19, 2007 and July 18, 2007.  (Tr. 273-76).  During these counseling sessions, Mr. Laird

reported difficulty sleeping and stress related to the disciplinary proceeding he faced at work. (Tr. 273, 275).  At his final counseling session, Mr. Laird told Mr. Roessler that medication had helped him control his emotions. (Tr. 276).

On May 30, 2008, psychiatrist Talmadge C. Reeves, M.D., performed a consultative psychiatric examination of Mr. Laird.  (Tr. 322-25).  Mr. Laird described spending most days watching television and helping with small chores around the house or in the yard.  *Id.*  He reported that he fed, dressed, and bathed himself independently.  *Id.*  Mr. Laird also noted that he was able to drive, and went to the grocery store and church each week.  *Id.*  Mr. Laird described having strong relationships with his wife,  children, and grandchildren. (Tr. 324).  Mr. Laird denied any hallucinations, delusions, or paranoia.  *Id.*  Dr. Reeves noted that Mr. Laird exhibited an ability to concentrate, had a well-functioning memory, and a normal affect.  *Id.*  Dr. Reeves found that Mr. Laird had an adjustment disorder and some depression, both of which were related to his recent job loss.  (Tr. 325).  Dr. Reeves opined that Mr. Laird had a Global Assessment of Functioning (GAF) score between 60-70.

On June 5, 2008, K. Wessel, Ed.D., reviewed Mr. Laird's records and completed a Psychiatric Review Technique form and a mental RFC assessment.  (Tr. 326-42).  Dr. Wessel diagnosed Mr. Laird with anxiety and an adjustment disorder with depressed mood. (Tr. 329, 331, 342). Dr. Wessel opined that Mr. Laird had moderate limitations in areas dealing with continuity of performance and adaptation.  (Tr. 340-42).  Dr. Wessel determined that Mr. Laird functioned in a "generally independent fashion," could mentally and cognitively meet his basic needs, could relate with others, and could negotiate in the community.  *Id.*  Ultimately, Dr. Wessel concluded that Mr. Laird's RFC was compatible with work related functions equated with competitive employment. (Tr. 342).

Aroon Suansilppongse, M.D., affirmed Dr. Wessel's assessment on October 21, 2008. (Tr. 369).  However, Dr. Suansilppongse found that Mr. Laird's ability to interact appropriately with the general public and ability to accept instructions and respond appropriately to criticism from supervisors were moderately limited. (Tr. 341, 369). Dr. Suansilppongse based this modification on Mr. Laird's reaction to anxiety and his infrequent episodes of irritability and temper outburst.  (Tr. 369).

On December 1, 2008, Mr. Laird told Dr. Huddleston that his depression symptoms were worsening. (Tr. 388). Mr. Laird was stressed about his unemployment status and financial situation. Mr. Laird told the doctor his grandchildren were his "only reason for living." *Id.*  Dr. Huddleston increased Mr. Laird's Zoloft prescription and noted that Mr. Laird saw a mental health therapist weekly.  *Id.*  Two weeks later, Dr. Huddleston adjusted Mr. Laird's Zoloft prescription and referred him to Behavioral Family Resources. (Tr. 387).

## V.  ANALYSIS

Mr. Laird contends that the ALJ erred in two ways.  First, Mr. Laird alleges that the ALJ failed to order a consultative examination to discover additional evidence of Mr. Laird's psychiatric condition prior to or after the November 10, 2009 hearing.  Second, Mr. Laird claims that the ALJ erroneously assigned little weight to the opinion of his treating cardiologist, Dr. Etherton.  For the reasons set forth below, Mr. Laird's arguments are unpersuasive.

### A.     The ALJ Did Not Err By Refusing to Order a Psychological Consultative Examination.

Mr. Laird argues that the ALJ erred by refusing to grant his request for a psychological consultative exam prior to or following the November 9, 2009 hearing.  The ALJ dismissed Mr. Laird's request for such an exam and opined at the hearing that "evidence of record was

sufficient enough to determine the severity of the claimant's psychological impairment." (Tr. 22).

Mr. Laird argues that the SSA regulations mandated a psychological consultative exam. However, "the regulations state that the ALJ has discretion in deciding whether to order a consultative examination." *Bishop v. Barnhart*, 78 F. App'x 265, 268 (4th Cir. 2003); *see also* 20 C.F.R. §§ 404.1519a, 416.919a (2002).   A consultative exam is only needed when the evidentiary record before the ALJ is inadequate.  *France v. Apfel*, 87 F. Supp. 2d 484, 489 (D. Md. 2000) *(citing Cook v. Heckler,* 783 F.2d 1168, 1173, (4th Cir. 1986).  A CE may be used to "resolve any conflicts or ambiguities within the record" or "to secure needed medical evidence the file does not contain such as clinical findings, laboratory tests, a diagnosis or prognosis necessary for decision." *Kersey v. Astrue*, 614 F. Supp. 2d 679, 693 (W.D. Va. 2009); *see also* 20 C.F.R. §§ 404.1519a(a)(2), 416.919a(a)(2) (2012).

The record before the ALJ was adequate to support his conclusions regarding Mr. Laird's mental impairments.  The record contains psychological assessments by Dr. Reeves, Dr. Wessel, and Dr. Suansilppongse.  (Tr. 322-25, 326-43, 368-69).  These documents, together with Mr. Laird's adult function reports, and his testimony at the hearing, provided the ALJ with sufficient evidence about Mr. Laird's mental state.

Dr. Reeves's May 30, 2008 evaluation concluded that Mr. Laird had a GAF score of 60-70, indicatng only mild limitations affecting his ability to work.  Mr. Laird's own adult function reports from March 29, 2008 and October 2, 2008 indicate that his mental health conditions remained relatively stable during that relevant period.  (Tr. 178-85,197-204).  Both reports reflect that Mr. Laird was able to perform household chores, care for himself, attend church weekly, and maintain his relationships with family members.  *Id.*

Dr. Suansilppongse performed a case analysis on October 21, 2008, and determined that, "[t]he claimant has mental capacity for simple work related activity with minimal limitation due to alleged pain."[2]  (Tr. 369).

The updated reports from Dr. Huddleston and Dr. Etherton likewise do not indicate any significant deterioration in Mr. Laird's mental condition.  At a July 30, 2008 appointment, Dr. Etherton included in his list of Mr. Laird's ailments "mild anxiety/depression," and noted that Mr. Laird would follow-up with Dr. Huddleston regarding his depression symptoms within the next week. (Tr. 344).  The notes from the visit to Dr. Huddleston on August 12, 2008 do not include significant indicators of increased psychiatric difficulties. (Tr. 349).  It is not evident from these notes that there was a significant change in Mr. Laird's mental state that would have made the record insufficient to make a psychiatric determination, or that created a conflict or ambiguity in the record to be resolved and thus make a CE necessary. *See  Kersey*, 614 F. Supp. 2d 679, 693 (W.D. Va. 2009); *see also* 20 C.F.R. §§ 404.1519a(a)(1), 416.919a(a)(1) (2008).  In fact, the records reflect relative consistency in the level and severity of Mr. Laird's mental health complaints.

Records post-dating Dr. Suansilppongse's October 21, 2008 assessment also do not mandate a consultative examination.  Though Dr. Huddleston's notes from December, 2008 refer to Mr. Laird's treatment for depression, three other pages of treatment notes contained in the

---

[2] Mr. Laird argues that Dr. Suansilppongse's notes from October 3, 2008 establish that his October 21, 2008 analysis was not based on sufficient psychiatric evidence**.**  On October 3, Dr. Suansilppongse noted that the Electronic File did not contain updated psychiatric evidence.  (Tr. 368).  He wrote, "before final adjudication, an updated psychiatric evaluation with mental status examination (if possible from the treating source) is needed." *Id.*  However, almost three weeks later in his October 21, 2008 report, Dr. Suansilppongse noted, "this consultant has reviewed all evidence in [the Electronic File] and the assessment of 06/05/2008." (Tr. 369).  Between October 3, 2008 and October 21, 2008, several pieces of additional information reached the Electronic File, including a report from Dr. Huddleston received on October 8, 2008, a report from Dr. Etherton received on October 8, 2008, and a report from Mr. Laird received October 14, 2008 (presumably his Function Report dated 10/02/2008, *see* Tr. 197-204). (Tr. 84).  Those new reports fulfilled Dr. Suansilppongse's need for updated psychiatric information, and established little change in Mr. Laird's condition from the time of his CE with Dr. Reeves in May, 2008.

record completed by Dr. Huddleston, at various appointments during 2009, either do not mention psychiatric issues (Tr. 385, 386) or list depression and fatigue among many other ailments.  (Tr. 384).  Dr. Etherton included "mild depression" on his list of diagnoses on November 25, 2008. (Tr. 389).  On September 1, 2009, Dr. Etherton again diagnosed Laird with "depression." (Tr. 390).  The ALJ agreed with Dr. Reeves's "finding that the claimant would have moderate symptoms due to his anxiety and depression." (Tr. 26).  The ALJ noted that Dr. Reeves's in-person assessment comported with the opinions of the State agency consultants, Dr. Wessel and Dr. Suansilppongse and that she assigned "great weight" to their analysis limiting Mr. Laird to "simple, unskilled work that is low stress, not at a production pace and with only occasional contact with co-workers." (Tr. 26).  The ALJ found that the limitations recommended by the state agency consultants were consistent with Mr. Laird's statements on his adult function reports.

The ALJ's analysis indicates that she weighed many appropriate sources of psychiatric evidence about Mr. Laird before reaching her conclusion.   The evidence of record was sufficient to support her conclusions and her decision not to order a CE is affirmed.

> **B.     The ALJ Did Not Err When Assigning Limited Weight to Dr. Etherton's Opinion.**

Mr. Laird argues that the ALJ improperly disregarded the opinion of his treating cardiologist, Dr. Etherton. (Mot. for Summ. J., ECF No. 14-1, at 5).  This Court disagrees.

The treating physician rule does not always require the ALJ to adopt a treating provider's opinion. While the ALJ must generally give more weight to a treating physician's opinion, *see* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2), where that opinion is not supported by clinical evidence or is inconsistent with other substantial evidence, it should be accorded significantly

less weight. *Craig,* 76 F.3d at 590. The ALJ need not give controlling weight to a treating physician's opinion on the ultimate issue of disability. 20 C.F.R. § 404.1527(e); SSR 96–5p.

The ALJ did not entirely disregard Dr. Etherton's medical opinion or use only the evidence that favored her ultimate conclusion. Rather, the ALJ assigned "little weight" to Dr. Etherton's opinion, in which he found Mr. Laird's heart disease resulted in a "marked" limitation and restriction on ordinary physical activity. (Tr. 383).

As the ALJ noted, Dr. Etherton's findings are not supported by any of his own observations. (Tr. 25-26). Although Dr. Etherton noted Mr. Laird had "severe coronary artery disease," he did not indicate specific medical findings to support that assessment. On January 23, 2008, Dr. Etherton noted that Laird "has done very well" since his last appointment and was not suffering from any chest pain, palpitations, or dizziness. (Tr. 345). This report also found that Mr. Laird "remains very active" and stated that he was "working a new job, reprocessing scrap metal." *Id.* Six months later, Dr. Etherton found that Mr. Laird had "no recent chest pains, chest pressure, shortness of breath, palpitations, dizziness, or loss of consciousness." (Tr. 344). These reports do not suggest that Mr. Laird was unable to perform simple basic tasks. In fact, Dr. Etherton "encouraged him to try to remain as active as possible" despite his cardiovascular issues. (Tr. 344). Yet, on November 25, 2008, Dr. Etherton's notes indicate Laird faced more substantial difficulty. He stated Mr. Laird "continues to have intermittent chest pains," and can do "minimal activity" with his symptoms. (Tr at 389). Dr. Etherton also stated Mr. Laird was "unable to complete even mild or moderate tasks." *Id.* This conclusion is far more drastic than the prior evaluations. However, despite the apparent dramatic worsening in activity level, Dr. Etherton ordered no new tests and recommended a regular six-month follow up. *Id.* On

September 1, 2009, Dr. Etherton noted that Mr. Laird had intermittent episodes of chest pain and shortness of breath, and that he fatigued easily.  (Tr. 390).

The ALJ found that there were no objective findings to substantiate Dr. Etherton's opinion that Mr. Laird's condition had deteriorated so dramatically between July, 2008 and November, 2008.  The ALJ noted that, during the relevant time period, Mr. Laird did not visit a hospital complaining of chest pains or cardiac distress.  (Tr. 25).  The ALJ also noted that Mr. Laird had not undergone any recent intensive cardiovascular analysis, and that his last test in May, 2007 indicated only mild reversible ischemia.  (Tr. 237).

The ALJ found that Dr. Huddleston's August 12, 2008 report recommending Mr. Laird for a commercial driver's license was inconsistent with Dr. Etherton's diagnosis of heart disease involving marked limitations in functioning. (Tr. 25). In his report, Dr. Huddleston answered "no" to almost every portion of the health history section, including the portions that asked if the applicant had "any illness or injuries in the past five years" or "shortness of breath" or "nervous or psychiatric disorders, e.g. severe depression."  (Tr. 353).  Dr. Huddleston did note that Mr. Laird had experienced "heart disease" or "heart attack" and "heart surgery." *Id*.

Dr. Etherton's restrictive findings were also contradicted by Mr. Laird's own testimony. In both of his functional disability reports, and at his hearing on November 9, 2009, Mr. Laird attested to his ability to complete basic tasks, such as dressing, bathing and feeding himself.  (Tr. 50, 178, 197).   In his functional reports, Mr. Laird stated that he fed and walked his dogs, watched television, made himself sandwiches, walked, drove a car, and went shopping for groceries. (Tr. 179-82, 198-201). He also stated that he left the house to attend church and sporting events. (Tr. 182, 201). At the hearing, Mr. Laird testified that he has no problem sitting, can lift about ten pounds, can vacuum, can wash dishes by hand, and can attend and sit through

church services.  (Tr. 58-62).  All of these activities contradict Dr. Etherton's opinion that Mr. Laird could lift zero pounds, could not stand or walk for any hours in a day, could not sit for any hours in a day, could never perform postural activities, and had severe restrictions on physical functions and environmental restrictions.  (Tr. 379-82).  Although Mr. Laird's own descriptions of his activities in his report and testimony indicate some limitations on his ability to function, they are significantly less restricted than Dr. Etherton's opinion.

 For the reasons described above, this Court finds that substantial evidence supported the ALJ's determination that Dr. Etherton's opinion merited limited weight.

## VI. CONCLUSION

Based on the foregoing, the Court DENIES Claimant's Motion and GRANTS Defendant's Motion.  A separate order follows.


Dated: <u>July 10, 2012</u>                                              /s/
                                                          Stephanie A. Gallagher
                                                          United States Magistrate Judge